Gregory CORAS
vs.
58 HEMENWAY, INC., et al
and
Joseph MONAHAN
vs.
Michael HECHT, et al

Nos. 132013, 132482

Superior Court
Commonwealth of Massachusetts

February 3, 1982

Stephen Greenbaum, counsel for plaintiff.
Richard Oshana, counsel for plaintiff.
Irving Goodman, counsel for defendant.
Flynn & Flynn, counsel for defendant.

## CONSOLIDATED FINDINGS, RULINGS, ORDERS AND MEMORANDUM OF DECISION

### Introduction

In civil action no. 132013 the plaintiff Gregory Coras ("Coras") claims that he was induced to enter into an agreement, pursuant to which he made a part payment of $10,000, to purchase an interest in a prospective restaurant business by

the misrepresentations of the co-defendant Michael Hecht ("Hecht"). Coras claims further that Hecht's conduct as well as being fraudulent was and is in violation of G.L.c. 110A, and he seeks return of his $10,000 plus various penalties. In his answer, Hecht generally denied all of Coras' allegations and asserts by way of counterclaim that Coras breached what was a valid agreement between him and Hecht and as a consequence of that breach, Hecht was not able to establish the planned restaurant business. Hecht asserts further that Coras' breach of contract amounts to a violation of G.L.c. 93A. In that civil action as well as in civil action no. 132482, Hecht has commenced a third-party complaint against the BayBank/Middlesex. The facts relevant to that complaint are essentially that the BayBank purportedly wrongfully refused to honor a check drawn by Hecht on the account of the defendant corporate entity, 58 Hemenway, Inc., which had been organized by the parties to serve as the entity which would operate the restaurant business, and that contributed to the planned restaurant falling through as well as being a violation of G.L.c. 93A.

In civil action no. 132482 the plaintiff Joseph Monahan ("Monahan") claims that Hecht fraudulently induced him to invest in the planned restaurant business, and he alleges that Hecht's actions in that regard as well also violated G.L.c. 110A. Monahan seeks recovery of the monies which he paid over to Hecht. In his answer to Monahan's claims, Hecht has again counterclaimed alleging breach of contract, but he has not asserted a G.L.c. 93A action against Monahan.

## Findings of Fact

After the trial of the above actions from the evidence by way of testimony, exhibits, stipulations and inferences therefrom, I find the facts material and relevant to the claims and counterclaims of all of the parties as follows:

Although he has no "formal" education or training in business, Hecht has both a Bachelor of Arts and a Master's in Education degree from Boston State College. By occupation or trade he is both an upholsterer and an upholstery salesman who, in June 1980, owned his own business in the Fenway section of the City of Boston. At that time, Hecht's upholstery business was not very profitable and he was barely making a living from it. As a consequence, Hecht was then actively seeking another business opportunity which would provide him with not only a profitable investment but a living as well.

In June, 1980, Hecht learned from a newspaper advertisement of premises for sale situated at 58 Hemenway Street in the Fenway section of Boston ("the premises"). The premises consisted of a vacant one-story brick building approximately 60 feet by 40 feet with a basement and had previously been occupied in part by a restaurant. In his own mind Hecht considered the possibility of acquiring those premises and of opening a restaurant there. Although Hecht had never owned any real property other than his residence and had no prior restaurant experience, he believed that a restaurant situated at the premises would be a viable business venture. Hecht was of the opinion that he could operate a restaurant at the premises which would serve efficiently and at a profit the large so-called "gay community" in the Fenway section of the City of Boston, which gay community Hecht believed would patronize a restaurant situated at the premises. Following up on his beliefs and his thinking about such a venture and with little, if any, practical investigation and planning, Hecht paid a deposit of $500 to the prospective seller of the premises and began to line up investors for the restaurant venture.

At that time, on or about June 14, 1980, Monahan, who had known Hecht since 1977 or 1978, was painting Hecht's home and was having coffee with Hecht's spouse when Hecht returned home. In June 1980, Monahan was a high school graduate with very limited business experience. He had been a painter/foreman for the past five years. Monahan is Coras' brother-in-law and was and is Coras'

employee. Hecht, Monahan and Hecht's spouse began to discuss the restaurant venture which Hecht had in his mind. Hecht described what he had in mind, and he informed Monahan that the venture would require a total investment of $45,000, consisting of $20,000 as a down payment to acquire the premises and $25,000 for renovation to the premises prior to opening the restaurant for business, with that latter amount being more of a guesstimate than anything else. During that discussion Monahan indicated that he might possibly be interested in investing in the venture because he had just recieved monies from settling an accident case. Hecht informed Monahan that he planned to retain 51% of the ownership of the venture, and indicated to Monahan that if he wished to invest $15,000 then he would receive a 25% interest in the venture as its first investor.

At Monahan's request, shortly thereafter Hecht and he went to inspect the premises. At that time, as viewed by Monahan, the premises were in considerable disarray with much obsolete equipment and fixtures littered about. After viewing the premises, Monahan informed Hecht that he did not have the entire $15,000 but would "get back to him" very shortly with an indication of how much money he could invest in the venture. The next day Monahan informed Hecht that he could invest $5,000. On June 16, 1980, both Monahan and Hecht went to Hecht's attorney's office to "get the paperwork done." When they all met, both Hecht and Monahan directed Hecht's attorney to keep the paperwork very simple and as a result, in a one-page agreement, Monahan agreed to invest $15,000 in the venture in return for a 25% interest therin and then made a partial payment of $5,000 to Hecht (see Exhibit #3). The day after Hecht received that $5,000 from Monahan, he paid $4,000 of that amount as a deposit to the prospective sellers to purchase the premises (see Exhibit #1). Monahan ultimately invested $12,300 in the venture.

During the discussions between Monahan and Hecht leading to Monahan's investment, Hecht advised Monahan that he, Monahan, should m a k e any investment quickly because many others "were beating down the doors" to become involved in the venture as investors. That representation was not true, but in my opinion, those words amounted to "puffing" rather than deceit. Hecht also represented to Monahan that whatever funds were required over and above any amounts which were raised from outside investors would be provided by Hecht. Hecht had no intention of providing any financial investment, believing that he would be able to raise all funds which would be necessary from outside investors. According to Monahan, Hecht advised him, and he relied upon the facts that both a beer and wine license went along with the premises and that a "full" liquor license could readily be obtained. Neither was the case, and I doubt that Monahan was so advised. In any event, it is incredible to me that Monahan relied upon any such information because no one could be that naive and not investigate whether such information was true or not. Sometime after June 16, 1980, Monahan painted and did other work at the premises at Hecht's request pursuant to agreements with Hecht and was paid for some and was not paid for other of that work. Shortly after Monahan invested in the venture, one Ronald Forino, a cook at a nearby restaurant, agreed to invest $5,000 in the venture for a 10% interest therein, pursuant to the same form of agreement employed previously by Hecht and Monahan (see Exhibit #4).

Coras first learned of the venture in late June 1980, from his brother-in-law Monahan. Coras had received an associate degree in aeronautical and space engineering from Wentworth Institute in Boston in 1972. In 1975 he received a B.S. degree in industrial technology from Northeastern University, and he thereafter matriculated for a M.B.A. from Babson College, but withdrew with seven courses to com-

plete. In early August 1980, Monahan telephoned Hecht and informed him that Coras was interested in becoming involved in the venture. Thereafter, in speaking by telephone with Coras, Hecht indicated that he and Monahan planned to purchase the premises, which was under a purchase and sale agreement, for $69,000 and that he was going to open and operate a restaurant there. Hecht further informed Coras of his belief that the restaurant would be profitable and that it would generate a cash flow which would be distributed. They discussed the possibility of Coras investing $25,000 for a 20% interest in the venture.

On August 7, 1980, Hecht and Coras first met in person in front of the premises, and Coras inspected the premises with Hecht and Monahan accompanying him. During their discussions at that time, Hecht indicated to Coras that he could "turn the premises over for $100,000" and that only a very limited amount of cosmetic work was required for, at the most, a cost of $25,000 in order to open the premises for business as a restaurant. Hecht indicated further that the restaurant could draw heavily from the large nearby gay community for patronage and that he knew how to operate a restaurant. As he had advised Monahan, Hecht told Coras that others were eager to become investors in the venture. Either then or at a later time before Coras executed the agreement referred to below, he advised Hecht that the amount of $45,000 which Hecht had guesstimated would be sufficient to capitalize the venture might not be sufficient. Coras pressed Hecht concerning such details as cash flow, "percentages", payment of salaries during the first week of operations and "all of the things he (Coras) knew nothing about." Coras testified that he did not believe everything Hecht informed him about the venture.

On August 10, 1980, Coras telephoned Hecht and informed him that he had decided to invest in the venture, and in response Hecht suggested that they meet the next morning at Hecht's attorney's office, which they did. On August 11, 1980, at Hecht's attorney's office, Hecht asked his attorney to show Coras the purchase and sale agreement for the premises and his agreements with Monahan and Forino. Coras claims that he did not understand these documents and that he wished to consult with an attorney to advise him. In response, Hecht again indicated that there were several other investors "waiting in the wings." Coras and Hecht then executed an agreement pursuant to which Coras agreed to invest $25,000 in return for a 20% interest in the venture (Exhibit #2). That agreement was in the same form as the agreements previously executed by Monahan and Forino with Hecht. Coras testified when he signed that agreement he did not understand its terms. That testimony is not credible.

After Hecht and Coras executed that agreement, they went to the BayBank/Middlesex in Newton ("the Bank") in order for Coras to deposit his initial payment of $10,000 pursuant to their agreement into a bank account for the venture. That Bank was Coras' choice of a bank to serve as a depository for the venture's funds. Just before they entered the Bank, Coras claims that he learned for the first time that Hecht was not putting up any of his own money for the venture. Coras testified that he indicated then to Hecht "You know, you got a real good deal, you are getting 51% for no money, and I have a good deal for my money too." When Hecht and Coras arrived at the Bank, Hecht indicated to a person there that he and Coras wished to open a "business" account. The Bank's Assistant Manager responded initially that without appropriate and required corporate authorizations a deposit to the credit of 58 Hemenway, Inc., could not be accepted. When Hecht threatened to deposit the $10,000 elsewhere, the Bank's Assistant Manager relented and accepted Coras' check for deposit to the credit of 58 Hemenway, Inc. (see Exhibit #5), which check was endorsed by Hecht as President of 58 Hemenway, Inc. The Bank's Assistant Manager indicated that

the account would remain "dormant" and checks could not be drawn on it until the appropriate paperwork was submitted to the Bank. That paperwork was delivered to the Bank on August 13, 1980, after 58 Hemenway, Inc., was organized as a Massachusetts corporation on that date. Exhibit #10 indicates that Hecht is President and Coras is Treasurer of 58 Hemenway, Inc., and that either can draw checks on its account at the Bank.

On August 13, 1980, Coras with a builder went to the premises to estimate what it would cost to prepare the restaurant to open for business. At Coras' request, Hecht and Coras met the next morning and when they met, Coras informed Hecht that he was no longer interested in the venture and requested that Hecht return his initial investment of $10,000. Hecht said "fine" and indicated that he would return those monies as soon as he was able to obtain a replacement investment. Later that evening, Coras telephoned Hecht and requested that they again meet at the premises at 9:00 A.M. the next morning. According to Hecht he had a feeling that Coras would seek to withdraw the $10,000 from the Bank in the morning. Hecht then telephoned his attorney, who advised Hecht to go to the Bank the first thing in the morning and to withdraw the amount of $9,500 by a certified check payable to the attorney and not to close out the account. Coras went to meet with Hecht the next morning as agreed, and when Hecht did not appear by 9:10 A.M., Coras telephoned the Bank and learned that Hecht was there and seeking to withdraw $9,500. Coras advised the person at the Bank with whom he was speaking not to permit Hecht to withdraw any money from 58 Hemenway, Inc.'s account. Coras then went to the Bank. When Coras arrived at the Bank, Hecht was in the Bank Manager's office with a Treasurer's Check in the amount of $10,000 payable to 58 Hemenway, Inc., Hecht and Coras (Exhibit 13) about to be given to him over his objection. Hecht had advised the Bank Manager that this failure to pay over to him the money deposited in 58 Hemenway, Inc.'s account would put the venture down the drain. The Bank's Manager was receiving conflicting and very heated signals from Coras and Hecht, i.e., each was yelling and screaming at him and making threats. The Bank did not request either Coras or Hecht to provide either a bond or an affidavit as referred to in Exhibit #17 before it provided Exhibit #13 to both of them, which it did on the advice of its legal counsel.

Two days after that confrontation at the Bank, Hecht informed Coras that he (Hecht) would not return the $10,000 which Coras had invested in the venture to him. Thereafter Hecht attempted unsuccessfully to involve other investors in the venture while paying expenses in the amount of $6,989. Other unpaid bills totalling $1,941 were incurred in the renovation of the premises. Ultimately Hecht gave up on the venture and the deposit of $4,000 he made to acquire the premises was returned to him.

## Rulings of Law

I find in sum, relying primarily upon assessments of credibility, that Hecht did not intend to defraud Coras and Monahan, that whatever misrepresentations he made with respect to the venture were neither material nor relied upon either by Coras or by Monahan, and that the venture failed for no reason other than Hecht's, as well as Coras' and Monahan's, lack of prior restaurant experience. There was no unfair and/or deceptive act and/or practice within the meaning of G.L.c. 93A, committed by any party. What the Bank did when it paid over the $10,000 check to 58 Hemenway, Inc., Hecht and Coras was the only reasonable thing to do under all of the then existing circumstances.

There was also no violation of G.L.c. 110 on the facts here. Coras and Monahan claim that Hecht's conduct was in violation of G.L.c. 110A. In particular they argue that Hecht violated G.L.c. 110A, §§ 301 and 403 by selling securities to them without prior registration of the stock or licensing of Hecht as an agent or salesman. However, G.L.c. 110A, §

402(b)(9) specifically exempts from §§ 301 and 403 "any transaction pursuant to an offer directed by the offeror to not more than twenty-five persons...in the commonwealth" unless the seller receives a commission or other remuneration for soliciting the sale. Coras and Monahan argue that Hemenway, Inc. employed Hecht as salesman and therefore §§ 301 and 403 should apply. However, that was not the situation on the facts here; Hecht in effect was Hemenway, Inc. and he received no commission or remuneration for the solicitation of the sale of its stock. Therefore, what occurred is exempt from §§ 301 and 403's requirements of registration and licensing.

Coras and Monahan also claim that Hecht's conduct violated G.L.c. 110A, § 101 in that it was fraudulent, deceitful and misleading. Unlike §§ 301 and 403 which apply only to sellers of securities to more than twenty-five persons, § 101 applied to this transaction by virtue of G.L.c. 110A, § 414 which states in part, "Sections 101...(shall) apply to persons who sell or offer to sell when (1) an offer to sell is made in the commonwealth, or (2) an offer to buy is made and accepted in the commonwealth." Section 101 makes it unlawful for any person in connction with offers and sales of securities to defraud, or to:

> make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or
> (3) to engage in any act...which operates...as a fraud or deceit upon any person.

Thus, on the facts found above, Hecht did not either defraud or mislead either Monahan or Coras within the meaning of G.L.c. 110A, § 101, in that any statements Hecht made to them were neither material nor reasonably relied upon by them in their decision to invest in the venture. Accordingly, there was no violation of G.L.c. 110A on the facts of this case.

**Order for Judgment**

Considering the facts found above, the only appropriate relief to be ordered in this action is to leave the parties where they are except to return to Coras and Monahan proportionally monies they have invested in the venture less monies already spent to carry out the venture as found above. Of course, counsel fees should not and are not awarded to any party. In sum, I order judgment to enter for Coras in the amount of $6,865.92,[1] and for Monahan in the amount of $8,445.08.[2] I order judgment to enter for the Bank and I deny all claims for G.L.c. 93A relief.

Paul G. Garrity
Justice of the Superior Court

---

1. $\dfrac{10,000}{22,300} \times 22,300 - 6,989$

2. $\dfrac{12,300}{22,300} \times 22,300 - 6,989$